213940 JK Products Services Inc v. JLW-TW Corp. Arguments not to exceed 15 minutes per side. Mr. Sullivan for appellant. It pleases the court, Brian Sullivan with the law firm of Des Moines Shoal, on behalf of the appellant, JK Products and Services, I preserve three minutes of rebuttal time. Unlike the two prior cases I just heard, this is, I would think, a more simpler case. We're not dealing with guidelines or anything else. We're actually taking ourselves back to the days of law school, and that is what remedies are available for a breach of contract and what is required to prove a contract. And there's really two things that we're talking about here. One is what we refer to in the record as the ETS agreement, and that is an agreement that my client entered into with the appellee, which essentially is a bunch of used parts. And the deal was kind of simple that for these parts, which the appellee would pay $245,000, they would take it out of our warehouse and do with it as they please. There was no dispute in the record that it was an as-is, where-is sale. The additional element which the court found was that part of that would be a referral that when consumers would call and seek service, that we would refer work to the appellee for that work on the ETS parts. And the other is that we would sell parts available to them. What the court ended up in its decision was it gave the appellee the proverbial cake and you can eat it too. They got all of the parts, all of the money that they paid for the parts, essentially they got them for free. Then the court read into the agreement, not only you must refer the calls to them, I'm going to require under specific performance, which I'll get to in a second why that's problematic, that you must transfer the 800 number to them, and then I'm also going to require that you sell them parts that are available at pre-November or October 2019 prices. The testimony... Did you challenge the award of restitution of $245,000? We did not. We recognized, we challenged the restitution in conjunction with the specific performance. But you are not separately complaining that restitution of $245,000 was appropriate here? You're right. In our brief, we challenged that it was a windfall that the restitution was not properly calculated, but in our three assignments of error, we did not identify it as one of them. So if restitution is the proper remedy, how do you make whole, by bringing back to the original situation, any investment that your opponents have made, such as cleaning out a warehouse or whatever other expenses they may have incurred to further this contract that's now being abolished? You would identify it had they presented evidence of that. That was sort of the problem, because the court, in its decision, recognized they didn't put on sufficient evidence to show what were the costs associated with the removal. Well, we did, right? Isn't there a testimony about $100,000 that you didn't challenge? Well, we challenged in the sense that it was... I can't remember the name of the witness, but one of the witnesses from Suntan Supply testified that he estimated it cost about $100,000. That's the cost they incurred, which seems like a reasonable estimate of what cost you would have incurred. I mean, you didn't challenge it anyway, so... Well, we challenged in the sense, well, what's it based on, other than what I would suggest was his speculation of a round number of about $100,000. It wasn't specific to, here's actually what it cost. So to say that we challenged it, we challenged it on cross-examination, I accept that the court, I guess, bought it, but the court didn't even recognize that in part of its decision. Right. The court didn't award that as part of the restitution. Right. And even the appellee, in its proposed findings of fact and conclusions of law, suggested the restitution remedy was what we paid at that time was $134,000, because remember they didn't even pay the remaining balance, and subtract what we gained from it. They sold parts for $90,000. They sold parts for another $5,000 and $7,000 until COVID hit. And of course, you're in the tanning business, and COVID unfortunately affected it in a very negative way. But even they recognize, you don't get your cake and eat it too. You have to accept that we got some benefit from this. And the restitution is... Wait a minute, you left that part on the table. You left the offset. We did. What we challenged then is the court took the next leap and went to specific performance. And specific performance, by definition, is to enforce the terms of the contract. We all think the easiest example is I go to buy a house. You don't sell me my house. I sue you and I seek specific performance, and that is the court orders you to transfer the house to me for the price we agreed to pay. Here, the court said the specific performance is a term that even the parties didn't testify to. It's not just a referral of the number. I'm going to require that you give them the 800 number. That's problem one. Problem two is for how long is this supposed to occur? The agreement is silent to the extent there is an agreement on that issue. It's silent as to how long it lasts. Am I hearing you argue that specific performance could be permissible in conjunction with an award of restitution? I think the answer is no, it is not permissible. I think the court made an error in ordering specific performance, and she compounded the error by making the specific performance something that the parties never even agreed to in the first place, and that is a number that was not part of the discussion and a time period that makes no sense. As we suggested on our brief, is it dependent upon the economy and so there's no market so we don't have to give the number? Is it when the appellee says, okay, we don't have any more sales, we don't need the number, or is it up to the court? So that's the first. What is your view? You're not challenging that restitution is appropriate here. What is your view about what would be appropriate restitution? I think the appropriate restitution is what the appellee asked for, and that was they took $134,000, they subtracted the $90,000 that they generated in revenue. That's the difference of $44,000. They added on, Judge Larson's comment, the $100,000 in cost, which I don't think is necessarily supported by the evidence, but that's what they added. Their total is $144,000, which is substantially less than what the judge ordered of $245,000. Where was that offer memorialized? That is in the record at 136 on page 6307. That is the appellee's methodology of the restitution that it sought. I'm looking at the pretrial brief, and my understanding of what Suntan requested at that point was that the ETS deal is constructively rescinded, JK retakes possession of the ETS parts, and the ostensible $200,000 purchase order credit is erased. Any profit received by Suntan on those that ETS sold on the parts should be offset against shipping, storage, and carrying costs related to the ETS transaction. Isn't that a different figure from the $144,000 that you're reciting? Completely different. We went to trial where their claim was the typical breach of contract damages. Then during closing argument, they said we're not seeking that, we're seeking restitution, in part because I think they failed on their proof of what were their lost profits and stuff like that. The court almost awarded a rescission damage, and that is to restore the parties back to what it was before, but the court couldn't do that because they sold some of the parts. Everybody agreed that of all of those parts, 90% of it, 80% of it was worthless, but they couldn't get the rescission because in order to get rescission, you had to give us back what we sold you in the first place, and they couldn't do that, so they sold it. So that's the problem with that. The second issue on the- Even an offset of what was that, $90,000? Yeah, they should have the offset, and that's what they even suggested in their proposed findings and conclusions. Then the court went one step further and gave a relief that nobody asked for. I mean, mind you, we went to trial and there's never a request for restitution, not in the amended answer and counterclaim, not in their pretrial brief, which Judge Schrantz, you just read from. I'm sorry, there was never a request for restitution? From the appellee until we got to trial. Okay, okay. And then when we got to trial, and they saw how the proof shook out, they came up with this other remedy, and then the court compounded it, not only with the specific performance I just mentioned, but then the specific performance of, I require you, JK, to sell them at pre-19 prices for- You're not challenging the two, I understand that today, if we were to recalculate all the restitution, your position is there should be the offset, a proper restitution award would be $144,000, is how you do the math. And the district court awarded $245,000, you're not contesting that. You're right, and I'm suggesting the district court should have stopped there. The specific performance that the court then added to that should not have occurred. So you're saying then, given the concessions that you have made, that a proper restitution solution is to award the $245,000 and to call it quits completely on the ETS contract? Well, yeah, I mean, to Judge Larson's question, really, I mean, I would say you should have given them what they asked for. Yes, but you're not challenging that here. Well, it's in our brief, we challenge it in the combination, it's sort of, we did a part and parcel with the specific performance. It's supposed to just isolate from restitution, but I grant you, we did not say, here's how you should recalculate the restitution. And what would happen to any remaining parts that Suntan still has? Well, under contract law, they would have to return them, you don't get the... When I asked you what's the proper restitution and said it was $245,000, you didn't bring up the parts. Right, right, because... Do you want the parts? We don't know what all is there. I think the remedy for this court would be to remand it to the trial court for further proceedings. I thought that nobody wanted these parts. Well, we don't know because there was a lack of evidence in terms of what was sold and not sold. So we don't know what all is there. The problem that the court was trying to address the fact that the parts have value only if they are appurtenant to the ability to have the customer call you so that you can either sell or use those parts for repair, right? True, true. That's just a practical, logistical issue. Right. Right? Okay. So one other question. So we've only talked about ETS, but you've got the LAMP agreement breach of $230,000. Yes.  Real quick, if I could. That goes to what makes up a contract? I mean, everybody would ask, what are the essential terms? When did this contract start? Mr. Gallagher is the only person who testified. He testified to four different time periods. He said it was in 2016. His lawyer said it was in 2017. And then the only evidence of October of 16 was the invoice they submitted after we filed the lawsuit. But what's the point of that? Does that go to the credibility of the witness? I mean, obviously, when a witness testifies as to different dates, it makes the witness less credible. Now, I respectfully suggest you can't escape by saying it's the credibility of the witnesses because you're not weighing one witness's testimony versus somebody else. You're weighing one person who gave you four different answers, none of which is the date the court chose. All of which goes to credibility, right? Yeah, but none of them are what the court actually chose. If he would have said, my memory is clear, I remember now it's October of 16. What he said was, all of my prior answers from the email, from my lawyer's letter, are incorrect. Yeah, so what turns on the date, though? The date was the invoice, which was their Exhibit 34, that they created after they were sued in the case. And the case law is pretty clear. If you're trying to figure out the credibility, or if you will, the competing issue, can you look at corroborating evidence that may or may not help you? And I asked him, did you ever carry this on your books as a receivable? And the answer is no. It's more corroborating that even they don't know when it started. That's only half the problem. Second is, and I know I'm out of time, but if I can answer this, what's the consideration? Everybody agrees that it was supposed to start at something less than $10,000 a month. That's Mr. Gallagher's testimony. He waffled between $9,000, $9,200, and then at some point it was supposed to escalate to $10,000 based on something of which they never identified what it was or when that occurred. The trial court's remedy was a $10,000 across the board for every month they're complaining until we terminated the contract in October of 2019. So there is nothing in the record to support the $10,000 from day one until day last. And I apologize I'm out of time, but I'll reserve my time for rebuttal. Good morning. May it please the court. My name is John Alton along with my co-counsel A.C. Vandenbosch. We represent Appellee JLW-TW Corp., better known as Suntan Supply. Let me first address the issue that Mr. Sullivan addressed last, which is this issue of the LAMP agreement. And I would respectfully disagree with Mr. Sullivan and say this goes exactly to credibility. The trial court sat through a full trial on the merits and heard testimony from all of the relevant witnesses. Mr. Sullivan's commentary here today seems to want to give himself credit for the fact that they didn't produce anyone to testify regarding their view of this issue. That gives Mr. Gallagher, who's in the gallery with us today, even more credibility. The trial court made clear in her ruling on the post-trial order that she found the Gallagher brothers incredibly credible. I think excessively credible was her description. And the J.K. witnesses, not so credible. This is supposedly an oral contract. Yes, Your Honor. And what are the terms? Your opponent ended with the statement that there was nothing that said it was 10,000 across the board. Mr. Gallagher testified that the context in which this issue came up is that we were a distributor for J.K. for 15 years. And we had certain exclusive rights to sell parts and equipment in a number of states. Over the years, that footprint of states grew from four, I think one to four, to ultimately 17. In 2016, Sunsea and Supply found out that J.K. was selling lamps directly to customers in our territory. They should have been funneling those customers to us. That was our territory. When Bill and Marty Gallagher called J.K. out on that, admittedly friendly. We're in this very symbiotic relationship where we're dealing in parts and service and calls and all these things. They raised the issue, hey guys, what gives? We found out that you're selling directly into our territory. This is when, in a handshake deal at a convention in Florida, they agreed to an understanding that you will pay us for essentially us tolerating your violation of our exclusivity rights. And Bill testified that the numbers that were agreed to were to start at 9,200 and that if we helped J.K. land another particular account that was in the Cleveland area, our clients based in Avon, Ohio, if we helped them land this account and essentially sell them direct, it would go to 10,000. That testimony was in the record. The other corroborating testimony that Mr. Sullivan is asking for can be seen throughout the record. It was clear throughout the record that J.K. liked to have its distributors, like Suntan Supply, rely on handshake agreements and oral agreements that were not necessarily memorialized like you might if you had sent the contract to Dinsmore & Scholl or Ulmer & Byrne or some other law firm to paper like a lawyer might. Nonetheless, that's how business was done between these two parties for years. The fact that the agreement was oral is further corroborated by the fact that soon thereafter, Suntan Supply started, for lack of a better term, nagging J.K., Hey guys, we have this accounting system where no one really pays an invoice ad hoc. We have all these credits and debits going back and forth based on Suntan Supply performing warranty service work, Suntan Supply buying product from J.K. The accounting departments would get together and chew all these things up and eventually some money would get transferred one way or the other every so often. It was relatively ad hoc, but it worked just fine for many years. Bill Gallagher testified that in 2016 he started again dunning J.K. saying guys, we need to start having you show us credit for this LAMP agreement. That's in the record. That goes through the change of management at J.K. that is one of the atmospherics behind this case in 2017 and 18. When new management comes in, Bill's continuing to say guys, guys, we have this deal with Don Feltham, the former CFO. The one who testified, yeah, the owners, J.K. is the American arm of a company owned by Germany. The ownership in Germany, they like these handshake deals. They like to be able to twist things or deny that they happened later on. Don Feltham, the CFO, the one that we dealt with, he testified to that. That's damning testimony. Now, Bill continued to try to get J.K. to live up to their end of the LAMP agreement. Not once, there's not a single piece of paper in email, not a single piece of testimony where someone from J.K. disagrees with Bill's memory of what happened at the convention. Bobby Wagner, who was the LAMP salesperson for J.K., he didn't testify at trial. While he testified via deposition, he had an email a year later, after a year of Bill nagging J.K. to start crediting us for the LAMP agreement. He said, he didn't say you've got it wrong. He didn't say that's the deal. He said, it is our position that there's no deal or you didn't live up to it. Again, the trial court had ample opportunity to examine all this testimony and was very clear and very stark in describing that she found that the testimony we put on was credible in this issue. And that was the $230,000? Correct. And by the way, I need to note, we asked for $360,000. We think the proper measurement would have been from October until the termination of the distributorship. The judge found, again, sort of sua sponte, Brian didn't even argue this trial, that no, once new J.K. management came in, they constructively terminated that agreement by... But the $230,000 is the figure. $230,000 is that figure. Can you address the ETS agreement? Yes, Your Honor. Let me turn to that. As an initial matter, it is true that we never prayed for specific performance, in so many words, as relief. Our post-trial findings of fact, we asked for an award of over $500,000 in damages on a restitution theory. Now, compared to the cases cited in J.K.'s brief, here we have a relatively complex matrix of obligations going back and forth. This isn't a house sale or something simple like that. The terms of the ETS agreement, as proven by the facts in the record, were we're going to take these kind of white elephant parts out. ETS was an older line of tanning beds that folks might have bought in the 90s or aughts, and that J.K. was moving to new, trendier lines of business. We were going to take those parts off their hands. Now, if you bought an ETS bed back in 2000, you would have a stamp on it or in your manual that says, call this number for parts. We took those off at the suggestion of J.K. Don Feldman, again, the CEO of J.K., urged us to take those parts. He said, we need to clear out this warehouse. New management's coming in. We're going to sell some real estate. Please take these parts off our hands. We agreed, both through conversations and as evidenced in the email back and forth, that we would take those off their hands. And so you did take them off. You did take possession and move them somewhere. Correct. We went down there at considerable expense. And again, as mentioned before, there was testimony in the record that $100,000 was the estimate of what it cost us to go down there, sift through the parts, hire trucks, all of that. The restitution award doesn't account for that. It doesn't. But you didn't challenge the amount of the restitution award. All you do is defend the specific performance award. So you didn't file a cross appeal. I'm not sure whether you needed to. No, Your Honor. In no way did you challenge the $245,000 as the amount of the restitution award. You just say, and we should also get specific performance. Correct. If you were going to do a true status quo anti-restitution award, it would need to be, and again, it's a little bit complicated because money didn't actually change hands. So when we talk about what Suntan Supply paid, it's more like what Suntan Supply was debited for. So at the time of the lawsuit, we were going to pay $245,000 for the ETS parts and this acrylic machine. At the time of the lawsuit, we had paid $135,000 of that. So there's a discounting for that. Correct. If we were to ask the question Judge Moore asked previously, what do you think an actual restitution award should have been? I think if you were going to try to pull it out from the overall accounting and just look at it as a standalone, it would be new cash credit to us of that $135,000 that we paid, which you would have to take out from the debits that we owed them. So again, it's a little bit working both sides of the balance sheet. The credits and the debits, does it or does it not add up to $245,000? Well, it doesn't. It doesn't account for a double. Judge Pearson's math charged us the whole $245,000 and then awarded $245,000 in restitution. She did not specify whether that was a coincidence or not to include the transaction costs to us. Transaction costs, do you mean cleaning fees? Shipping, hauling the stuff up from Arkansas to Cleveland, all of that. So the carrying costs of completing that sale. Both Judge Larson and my questions are directed at if we all agree that restitution is the proper remedy here, what should the restitution award be in your view? I think I agree with Mr. Sullivan that it would probably have to get remanded for I think relatively brief proceedings. The trial court just to spell out the math. I agree that what would happen would be we would need to make sure that we are getting full net credit for what we have paid, which would be the $135,000 out of pocket and then dealing with the $110,000 unpaid as part of the overall true up of credits and the other line items. Plus the $100,000 for the transaction fees and the carrying costs. Now, I don't think it was error for the court to be concerned about the intangible harm to my client that was represented by us not having the 800 numbers or the ability to buy replacement parts. But you did have them for a substantial period of time and they didn't get credit for that. Well, no. So, Your Honor, it is true. I don't disagree that you would have to deduct from a restitution our net profits that we obtained. Well, that's net revenue. I would want to further consider whether it should be net revenue or net profit. That should be the deduction. I don't think net profit is in the record on that case. But do you agree that if a restitution award is the method that specific performance is not allowed? I disagree, Your Honor. I respectfully disagree. I think the case law is clear that the trial court has discretion to fashion recovery that it thinks remedies the harm. I agree it can't be a double recovery. I think that's the underlying... The question here is not whether it's double recovery but whether one remedy bars the other. In other words, if it's restitution you get, then you need to define everything within the context of restitution that would return you to the position that you had paid out, that would make you whole. But specific performance is a different remedy and they're both equitable remedies that the law appears, I think, to fairly clearly say you can't have both. You need to select. So is it that she denominated the specific performance part as specific performance when my reading of the record is that you didn't request that and instead should have called it a form of restitution? We're struggling. I don't think you can say I get restitution and I get specific performance. Am I incorrect? I disagree with a nuance. The nuance being obviously there are different aspects of this deal or benefits of the deal that might be subject to being denominated in dollars where there might be others that are not... The court found that traditional legal remedies would not remedy what she almost described as an unjust enrichment. That there was this... The benefit of use of the 800 number and really it's customer flow. Can you bring in an unjust enrichment claim? Yes. A standalone unjust enrichment claim under Ohio law when there is a contract that covers the same conduct? Your Honor, I'm aware of the... You didn't bring one. No, and again... You couldn't? That's true. That's not how we argued our damages. So obviously while the trial court's denomination of damages is both less in dollars and different in methodology and verbiage than what we asked for. I think the question is is it an abuse of discretion given the flexibility that the notions of equity give a court to fashion relief to affect all aspects of relief as part of this contract? What about your opponent's argument that the specific performance award that was awarded which is a long-term use of the 1-800 number is a totally inappropriate remedy here? Your Honor, I see my time is up. Yes, you can answer that. I respectfully think that that is a pretty easy answer. And again, I think that it's just a phone number and it's just not blocking us from ordering parts. It's not a constructive entanglement. At a particular price. Well, I do think I agree that the words that the judge used were not 100% clear regarding the rate. I think it is reasonable to infer that she meant the then prevailing rate. I don't know that she meant to lock in the prices as of the date of the order as such. Isn't that a weakness of this order that the prices could vary Your Honor, in the commercial world as you well know contracts don't necessarily specify a price per se. We could have an agreement and there could be a meeting of the minds that we will you will charge us your prevailing wholesale price without it being $5 or $10 or $100. So, a pricing mechanism that doesn't necessarily have a dollar figure is not unenforceable when by reference to the course of conduct the way the industry works and other factors you can infer just charge them the wholesale price that you've charged them for the last 15 years. Might I ask you if I might about your pre-trial brief that I spoke about earlier that is might be denominated as one select remedy that would under a name that would entail everything that you've spoken about and this was one of your alternatives is that JK retakes which I assume that means they pay to come get the parts and get rid of them. They retake possession the $200,000 purchase order credit is erased  of items that you made there. The profit received is offset against all of the other items that we've been speaking about. Shipping, storage, carrying costs all related to the ETS transaction. Where is where are you on that remedy? Your Honor I think that as I mentioned before if you were going to do and for lack of a better term old-fashioned restitution and do the status quo ante I'm not sure anyone the benefit of these parts yes there is frankly there is probably more benefit to the marketplace I do think there was testimony talking about how the non-transfer of the calls led to consumers with old ETS beds kind of falling through the cracks and being stuck in getting upsold to JK new equipment so setting aside I agree that's one of the atmospherics that's here but you would have to figure out what to do with the parts themselves again I think the testimony is pretty clear that the parts as such don't have a ton of value I don't know if in a pure restitution case wouldn't the parts go back in theory at their cost wouldn't that be specific restitution I mean to send them exactly back like physically well no you're right to the extent everyone agrees the parts are  worthless you can just offset zero dollars and it would constructively do the same thing presumably at some cost and hire and restitution are incompatible and since you asked for restitution the right award is restitution what would you have this court do would we remand to the district court or would we say well there's an award here restitution in the amount of $245,000 neither of you challenge it be done well I mean technically I think that performance yeah I think that number is close to the number that you would get if you started the math from scratch and did it on the line items that we're talking about here today whether going through that exercise would be worth the time and effort I don't know because I think well isn't that the right I mean assuming that you both had argued for restitution the  comes up with $245,000 why don't we I'm just talking why don't we just say $245,000 restitution the end goodbye I agree that number is if we went through and did the whole exercise in a more linear way like we're discussing here I bet you would come up at the same number or very close a lot of time and energy waste of money for you all to challenge it at the district court level and then for the loser to this case in talking for myself interesting idea and wonderful mediation great mediation here it they've succeeded so red light I take your point yes we have me react to that suggestion as a start thank you I will do it in reverse order since I short shrifted the lamp agreement but before you get to that what do you think of the idea that call it quits at 245 or at least go to mediation and you don't have to answer now but it seems like an interesting I agree your honor that the case has dwindled down to 245 and yes I mean we started with a multi-million dollar claim through a lot of work we went down through a prior summary judgment ruling that essentially eviscerated their larger breach of contract claim on the distributor agreement and so we are here and then and the reason you know we're here in front of you is because you know the court the trial court imposed upon us this overarching you know essentially like a monitoring if you will that were to provide and interact with this this customer this distributor for some period you know on infinite I mean that that's the you know the reason we're here but obviously we don't want that and I don't think legally it's supported just a couple quick points on the on the lamp agreement Judge Larson you're right they did not cross appeal so it's not a question of where the court should have ordered more if you look at you know our point is you got to get to what's the term and Mr. Gallagher testifies on page 6204 of his trial testimony that it started at $9,200 and there's no way you can recognize rationalize or make compatible that testimony and the trial court's finding. What about the testimony that said that they got you that Suntan availed you of the right to have an Ohio based purchaser in their exclusive distributor category the geographic area and that you ended up at about $10,000 a month for your right to have an incursion into their distribution area? The trial testimony your honor is completely void of when that occurred if it did occur at all. The only testimony was an entity called TANPRO that it would go to $10,500 if they delivered TANPRO and Mr. Gallagher testified that never occurred. So we're dealing with this unknown entity. I'm sorry your testimony you're saying that the testimony at the hearing is that you is that your client did not get that new client. There's no testimony as to who the client was when that occurred to invoke this let's go to $10,000. No testimony at all. And our point is even... I just thought that Gallagher had testified that he brought your client business from this TANPLEX salon chain at the price of $10,000. No, page 6205 of the trial testimony is that he acknowledged that TANPRO was not part of the deal. And the issue there goes back to the fundamental and the standard here I get is clearly erroneous because it's the factual findings of the trial court but you can't now read into and say we think it's $10,000 or we think it's $9,500 or we think it's something else. They have the burden to prove what were the essential terms of the agreement. But they don't have a burden to prove it by a specific date, right? I mean an oral agreement is an oral agreement that may morph over time which is in fact the relationship that your two entities had for probably 15 years. True, but did they get to what's the dollar number? You got to say what's this, when did it start? And you can't put your thumb on it and say this is what the testimony was. That's when it started and you can't say... You didn't bring an argument saying well if it started at this place then the damages would be this. Your whole argument is there was never a contract. My argument is they didn't meet their burden to prove a contract and to prove material terms. Material terms are price and the length of the contract. The trial court ended the end date by saying when we terminated the overall agreement in October of 19, we also terminated anything relating to the LAMP agreement to the extent it existed. But to answer your question, my point is they didn't prove there was a contract so the 230 should be zero for failure of proof. Not let's read something else into it and say maybe it's 180, maybe it's 150, maybe some other number. Contrary to the ETS, I'm sorry. I thought all your testimony about the date goes to when the contract was formed, not whether the contract was formed. But if you're going to fashion a remedy, you ask the question what is the contract? Sure. Okay, when did it start? Well, I don't know. Well, give me some evidence. You could have a contract where you don't know when it starts but you have an agreement that people. But you can't fashion a remedy like the trial court did to a specific dollar amount based on a specific period of time. Are we back to the failure to cross appeal? Well, yeah, but the trial court's order was 23 months. So if you do the math, she said 23 months started on October 16 and she started at $10,000 from day one. That's the problem with the trial court's decision. She, and I think it's paragraph, I want to say 58 of her findings of fact. I may be wrong on that particular paragraph but that's what she concluded. So then you do the, well, how did she get there? She started on October 16, she said it was $10,000 at the beginning. Neither of those two are in the record and therefore it should be zero, not some other remedy. And so it was beyond her discretion, having heard all of the evidence, to formulate a remedy that she thought was appropriate in light of all the testimony? Correct. She went beyond the ability to fashion a remedy. This is where you get to the clearly erroneous. You can't just make it up and say this is what I think it is. And if I could add real quickly, I know I'm out of time. No, you are out of time. Oh, I'm sorry. You're way out of time. I appreciate that. But we understand the arguments that have been made both in the briefs and here. And we appreciate your argument as we appreciate the argument of the other side as well. And the case will be submitted. But we do encourage the use of our mediators given what has transpired at oral argument. Thank you, appreciate it.